# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ASSA ABLOY SALES AND MARKETING GROUP, INC., <br>     *Plaintiff*, <br><br> v. <br><br> TASK, FCZ, <br>     *Defendant*. | No. 3:15-cv-00656 (JAM) |

**MEMORANDUM OF DECISION**

This is a lawsuit about one company's theft of trade secrets from another. In 2014, defendant TASK, Fcz filed an arbitration claim for breach of contract against a corporate sibling of plaintiff Assa Abloy Sales and Marketing Group, Inc. Defendant brought this arbitration claim against plaintiff on the basis of information it learned only as a result of misappropriating a USB drive that belonged to plaintiff. Defendant lost its breach-of-contract arbitration claim, and plaintiff has now brought this federal diversity lawsuit under the Connecticut Uniform Trade Secrets Act and Connecticut computer crimes laws, principally seeking damages for the legal fees that it incurred to defend against the arbitration.

Following a bench trial and consideration of all the evidence, I conclude that plaintiff has proven its claims by a clear preponderance of the evidence. Plaintiff is entitled to compensatory damages in the amount of $1,146,489.55, as well as punitive damages in the amount of $2,292,979.10, and an award of costs and attorney's fees. Defendant is further ordered to return the USB drive to plaintiff and to destroy all copies of the information from that drive remaining in its possession, and enjoined from any future use of that information.

1

# FINDINGS OF FACT

The Court heart trial testimony over a period of just one day on July 31, 2017, from the following individuals called by plaintiff:

- Ted Yong (general manager for Assa Abloy Americas International)
- L. Page Heslin (general counsel and secretary for Assa Abloy Americas)

Defendant did not present any witnesses. Based on the testimony, documentary exhibits, and stipulated facts, I make the following findings of fact.[1]

Plaintiff Assa Abloy Sales and Marketing Group, Inc. ("Sales and Marketing Group") is a Delaware corporation with its principal place of business in New Haven, Connecticut. Plaintiff is a corporate subsidiary of the Assa Abloy Group, a leading manufacturer of doors and related products. Specifically, plaintiff is part of Assa Abloy Americas, which also included the Assa Abloy Door Group, LLC ("Door Group"). Plaintiff provided sales and marketing services to other corporate subsidiaries of Assa Abloy Americas, including the Door Group. Assa Abloy Americas International was an operating company within the Sales and Marketing Group, and Ceco Door Products ("Ceco") was an operating company within the Door Group. Ceco, located in Milan, Tennessee, manufactured hollow metal doors.

Defendant TASK, Fcz ("TASK") is a company owned by Shafaqat Santrampurwala and Kashmira Shafaqat, organized under the laws of the United Arab Emirates ("UAE"), with its principal place of business in Sharjah, UAE. Defendant is in the business of distributing, manufacturing, and selling doors and locks. Defendant entered into two contracts with Ceco: a Distribution Agreement in 1995 and a License Agreement in 2003. The former agreement

---

[1] In making these findings I rely in part on the factual findings from the earlier arbitration ruling in this matter, included here as Plaintiff's Exhibit #5. *See TASK, Fzc v. Assa Abloy Door Group, LLC*, Case No. 50-20-1400-0257, Final Award (Sep. 28, 2016).

allowed TASK to sell door products manufactured by Ceco in America. This eventually proved too expensive a business model, and so it was replaced by the latter agreement, which permitted TASK to manufacture Ceco products itself in the UAE, in exchange for royalty payments to Ceco. But Ceco terminated its relationship with TASK in 2012, after concerns about the quality of TASK-manufactured products and delinquent royalty payments.

The events at issue in this case chiefly arose from the activities of Jim Peairs, a business development manager for the Sales and Marketing Group who was responsible for the TASK/Ceco account. As such, Peairs would travel to the UAE several times in a given year, and on one of his trips to the UAE in late September 2012 he misplaced a USB drive.[2] This was shortly after TASK's relationship with Ceco had been terminated. Around that time Peairs became sick with pneumonia, and in late November 2012 he died of cancer.

After Peairs lost the USB drive, Tariq Shafaqat, son of the owners of TASK, found it. Thereafter, Ms. Shafaqat printed the entire contents of the drive, over 1,100 pages, a print job that took almost an entire day. The documents from the USB drive, which were introduced into evidence as Plaintiff's Exhibit #2, include numerous sales and financial records from Ceco, as well as copies of Peairs' passport, driver's license, insurance, and credit cards.

Ms. Shafaqat testified at the arbitration hearing that Peairs gave her permission to access and print the contents of the USB drive, but the arbitrator found this claim incredible, and I agree. The evidence at trial did not support any plausible reason why Peairs would have given TASK permission to access a drive containing so much of his personal information, especially

---

[2] Mr. Yong's trial testimony suggested that the USB drive was lost in June 2012; the arbitration ruling concluded that it could not have been lost prior to September 23, 2012. Plaintiff's Ex. #5 at 5. I conclude that the drive was lost during Peairs' September trip, though precisely when the drive was lost is ultimately of little moment to my decision.

since this would have been a flagrant violation of his professional obligations to Assa Abloy, which had just terminated its business relationship with TASK.

Armed with the information from the USB drive, defendant filed a claim against Ceco for breach of contract before the American Arbitration Association on March 20, 2014. This case was based in substantial part on the documents from the USB drive, and in fact defendant would not have brought the case without those documents. Defendant stated as much in its Statement of Claim. Plaintiff's Ex. #1 at 5 ("TASK did not discover that Ceco violated the Distribution Agreement and License Agreement until June 2012, when TASK discovered a USB drive in one of its vehicles. . . . TASK would not have been able to detect these breaches of contract otherwise."). Defendant did not just rely on these documents, however, but altered several of them to bolster its case against Ceco.

The arbitrator ultimately rejected defendant's claims against Ceco, and imposed sanctions of $274,257.24 against TASK for the fraudulent alteration of evidence. *See* Plaintiff's Ex. #5. Plaintiff's total legal expenses incurred in defending the arbitration claims were $1,156,424.66.

Plaintiff filed the instant lawsuit on May 1, 2015, alleging violations of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-50, *et seq.*, and Connecticut computer crime laws. Conn. Gen. Stat. § 53a-251; Conn. Gen. Stat. § 52-570b.

## DISCUSSION

I will first address several threshold arguments made by defendant for why I should not reach the merits of plaintiff's claims. Then I will discuss plaintiff's claims on the merits.

### *Standing*

Defendant first argues that plaintiff lacks standing to pursue these claims, "because the documents at issue do not belong to them." Doc. #34 at 28. I do not agree. Article III of the

4

Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. From this requirement that there be an actual "case" or "controversy" for a court to resolve comes the principle that any plaintiff in a federal court must have "standing" to assert his or her claim—specifically, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014); *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449–50 (2d Cir. 2014).

Contrary to defendant's suggestion, it is clear that many of the documents on the USB drive, at the very least, did belong to plaintiff. A quick perusal of the documents shows that most of them, if they list any corporate name, list Assa Abloy Americas International, which is an operating company of Assa Abloy Sales and Marketing. Some documents do name Ceco or the Door Group, but this is not surprising. Mr. Yong testified, in response to questioning by defense counsel, that many documents important to Sales and Marketing would also be important to the Door Group, and that both groups had an interest in the documents on the USB drive. Plaintiff suffered a clear injury in fact when these documents, its property, were (allegedly) stolen. This injury resulted directly from defendant's alleged conduct, and would be redressed both by an award of money damages and by an injunction preventing defendant from making further use of the information from the USB drive. Plaintiff has standing to pursue these claims.

*Preclusion*

Defendant next advances a series of arguments regarding the preclusive effect of the prior arbitration decision: that, under the Distribution and License Agreements, this dispute should have been submitted to arbitration; that the case should be dismissed on grounds of *res judicata*;

5

and finally that the case should be dismissed on grounds of collateral estoppel.[3] None of these arguments have merit.

First, plaintiff's claim was not subject to the arbitration clause of either the Distribution Agreement or the License Agreement. The former contained a clause stating that "Disputes arising between the parties, hereto, involving this agreement shall hopefully be settled amicably. . . . If any dispute or breach cannot be resolved by negotiation, then any controversy or claim relating to this contract shall be settled by arbitration." Plaintiff's Ex. #1 at 22. The latter likewise stated that "Any controversy or claim between the Parties arising out of or relating to this Agreement shall be determined by arbitration." *Id*. at 35. But this is not a case "involving," or "arising out of," or "relating to" these agreements. Plaintiff is not suing on these contracts, but rather for alleged tortious conduct independent of the contracts.

This is not a case like *Fink v. Golenbock*, 238 Conn. 183 (1996). There, the Connecticut Supreme Court held that tort claims relating to a former employee's violation of an agreement not to compete were covered by a similarly-worded arbitration clause, because "the predicate for these claims is a dispute arising under the employment agreement between [the parties] because it is this agreement that establishes the employment relationship from which the underlying conduct that forms the basis of the dispute stems." *Id*. at 197. In other words, the alleged tortious conduct in that case was only wrongful because of the existing contractual relationship between the parties.

---

[3] "Under the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter that was offered to sustain the claim, but also as to any other admissible matter that might have been offered for that purpose." *State v. Long*, 301 Conn. 216, 236–37 (2011). By contrast, "[c]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action." *New England Estates, LLC v. Town of Branford*, 294 Conn. 817, 838 (2010); *see also Ventres v. Goodspeed Airport, LLC*, 301 Conn. 194, 205–06 (2011) (discussing distinction between claim and issue preclusion).

Here, to the contrary, defendant is alleged to have stolen trade secrets and unlawfully accessed a computer system, both offenses that could have been committed by perfect strangers. Plaintiff's claims do not simply piggyback on an alleged breach of contract (indeed, plaintiff has never brought a breach of contract action against defendant). And while Connecticut courts do construe arbitration language like that in this case broadly, *see id.* at 196, that does not mean such language should be read as encompassing any possible disputes between the parties. Rather, the arbitration clause applies by its terms only to disputes "arising out of or relating to" the agreements. Plaintiff's claims here are separate from and do not arise out of or relate to the contracts between the parties. Accordingly, plaintiff was not required to submit those claims to arbitration.

Second, plaintiff's claim is not barred by claim preclusion (or *res judicata*). Claim preclusion may apply to bar subsequent actions for claims that could have been brought as counterclaims in earlier proceedings, but only under certain narrow circumstances. Specifically, a defendant who could have brought a counterclaim in an earlier proceeding is barred from maintaining a future action on that claim "if (a) The counterclaim is required to be interposed by a compulsory counterclaim statute or rule of court, or (b) The relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." Restatement (Second) of Judgments, § 22(2); *DeMilo and Co., Inc. v. Commissioner of Motor Vehicles*, 233 Conn. 281, 293 (1995) (same).

Defendant has cited no compulsory counterclaim rule that would have required plaintiff to bring this claim in the arbitration hearing. Certainly the principle of Fed. R. Civ. P. 13(a), which makes compulsory any counterclaim arising out of the same transaction or occurrence as

7

the original claim, would not have made plaintiff's claims here mandatory in the arbitration case, which concerned alleged breaches of the License and Distribution Agreements by Ceco, not theft of a USB drive containing trade secrets by TASK. Nor would a judgment in plaintiff's favor here in any way implicate or nullify the arbitration award—which, in any event, denied defendant's breach of contract claims.

Defendant argues that plaintiff's claims should have been brought in the arbitration case because that case devoted significant attention to the matter of the USB drive and the documents defendant acquired from it. In essence, defendant argues that, because the arbitration ruling addressed the competence of the evidence that had been submitted in the arbitration case itself, it should also have encompassed any malfeasance in the acquisition of that evidence. But this does not follow. As the arbitration award notes, both the arbitration rules and the arbitration clauses at issue conferred upon the arbitrator broad powers to sanction a party that "fails to comply with its obligations" under the rules or "participates in the arbitration in bad faith." Plaintiff's Ex. #5 at 13. And the arbitrator must necessarily rule on the admissibility of evidence presented before her. A ruling on these evidentiary matters, as well as on Ceco's motion for sanctions for the fraudulent alteration of evidence, necessarily required considerable examination of the circumstances surrounding defendant's acquisition of the USB drive. But that does not mean that any of these rulings involved a final adjudication on the merits of plaintiff's claims for any and all misconduct concerning the USB drive.

Indeed, there is nothing anomalous about certain issues being contested separately in an evidentiary ruling and in a separate tort suit; for instance, a criminal defendant might object to the admission of evidence obtained through an illegal search and seizure in violation of the Fourth Amendment, and separately bring tort claims against the officers who conducted the

8

unlawful search. That is not even what happened here, because the improper acquisition of the documents was never at issue in the arbitration case, only their improper alteration.

Finally, plaintiff's claims are not barred by issue preclusion (or collateral estoppel). This follows directly from the fact that no issues relating to the improper acquisition of the USB drive or its contents were ever decided in the arbitration ruling; collateral estoppel applies only to issues that were *actually* adjudicated by a prior decision. The only portion of the arbitration ruling that comes close to addressing the issues in this case is the ruling on Ceco's motion for sanctions, which addressed alteration rather than acquisition (and was in any event decided against defendant). In short, defendant has failed to show that any threshold barriers of standing or preclusion should prevent the Court from considering the merits of plaintiff's claims.

*Trade Secrets*

The Connecticut Uniform Trade Secrets Act ("CUTSA") provides a cause of action for the misappropriation of trade secrets. Conn. Gen. Stat. § 35-53(a). Misappropriation is defined in relevant part as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Conn. Gen. Stat. § 35-51(b)(1). The statute goes on to define "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain, or espionage through electronic or other means, including searching through trash." Conn. Gen. Stat. § 35-51(a). And for purposes of CUTSA, a "trade secret" is defined as "information . . . that (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d). Accordingly, in order to make out a claim under CUTSA, plaintiff

must show (1) that the information on the USB drive included trade secrets; and (2) that defendant used improper means to acquire that information.

It is clear that the information on the USB drive derives economic value from not being generally known to others. As Mr. Yong testified, the USB drive contained confidential sales and profit numbers for Ceco. If Assa Abloy's competitors gained access to this data, Yong stated, they could "utilize it to get into pricing strategies against Assa Abloy," ultimately getting into either "a much more competitive situation or . . . a situation where they're able to be much more profitable than they would have had they not had this information." Tr. at 23.

The USB drive also contained information regarding the projects Assa Abloy was involved in, and the distributors with whom they were working on those projects. Mr. Yong testified to a number of strategic reasons why the company would not want this information becoming public. Tr. at 27. Several of the documents examined at trial did seem of limited value, as they pertained to activities undertaken in 1999, but I am satisfied that the USB drive did contain a significant amount of information that derived value from being kept confidential. And while defense counsel attempted to argue through his questioning of Mr. Yong that defendant could have obtained this information from plaintiff's contractors, the witness made clear that certain key pieces of information, the cost and profit margin figures, would not be known even to Assa Abloy's own partners and distributors. Tr. at 46–47.

A closer question is whether the company's efforts to keep that information confidential were reasonable under the circumstances. The record on this point is thinner. Unfortunately, Mr. Peairs passed away shortly after losing the drive, and was unable to testify about any efforts he might have made to recover the drive, or indeed whether he even knew it was missing in the first place. But Mr. Yong did testify that plaintiff's employees would sign confidentiality agreements

promising not to disclose this type of information. Tr. at 50. He stated that business meetings would be subject to a no-cellphone, no-camera policy, and would begin with recitations of the sensitive nature of the information to be discussed. *Ibid*. And he stated that the company's computer systems contained "a lot of back-end ways to eliminate the data had it gone into the wrong hands." *Id*. at 51. Ultimately therefore I do conclude that the company's efforts to maintain the secrecy of this information were reasonable under the circumstances. I therefore hold that the information on the USB drive qualified as trade secrets for purposes of a CUTSA claim.

In addition, it is also clear that there was misappropriation in this case. The parties do not dispute that defendant came into possession of the USB drive at some point after one of Mr. Peairs's trips to the Middle East. Defendant suggests that Mr. Peairs gave up the USB drive willingly. I find this suggestion speculative and highly unlikely. Mr. Yong and Ms. Teslin both testified at trial that TASK did not have authorization to view or print the documents on the USB drive. Defendant introduced no actual evidence to the contrary, only its unsubstantiated suggestion that Mr. Peairs might have given such authorization. The record does not suggest any reason why Mr. Peairs would have given defendant permission to view the documents.

Of course, without the testimony either of Mr. Peairs or from anyone associated with TASK, we cannot really know what happened in the UAE back in 2012. But the preponderance of the evidence, indeed all the evidence in this case, suggests that defendant acquired the drive without permission, and then, knowing it did not have permission to do so, decided to access the information on the drive and then to use it (and alter it) to mount a spurious arbitration claim against Ceco. In other words, defendant misappropriated plaintiff's trade secrets, exactly what CUTSA forbids.

*Computer Crime*

Connecticut law also provides a cause of action for any person who has been aggrieved by the commission of a computer crime. Conn. Gen. Stat. § 52-570b(c). The state's criminal code lists several forms of computer crime, Conn. Gen. Stat. § 53a-271. These include unauthorized access to a computer system and the misuse of computer system information.[4] Ultimately what plaintiff must prove to prevail on its computer crime claim is that defendant knowingly accessed its computer system without authorization, or used the information from that system in an unauthorized manner.

"Computer system" is defined as "a computer, its software, related equipment, communications facilities, if any, and includes computer networks." Conn. Gen. Stat. § 53a-250(7). The USB drive falls under this definition, as related equipment.

I have already concluded, by a preponderance of the evidence, that defendant accessed the drive without authorization. I further find that defendant did this knowing full well that it had no authorization. Defendant has not introduced evidence to support any claim of good faith belief that it had authorization. And if indeed Mr. Peairs did not give defendant permission to access the drive, as I have concluded, then presumably defendant knew that no permission had been given. Insofar as defendant has raised any of the affirmative defenses to a charge of unauthorized access to a computer system, *see* Conn. Gen. Stat. § 53a-251(b)(2), it has failed to establish those defenses.

---

[4] Unauthorized access to a computer system occurs when any person "knowing he is not authorized to do so, accesses or causes to be accessed any computer system without authorization." Conn. Gen. Stat. § 53a-251(b)(1). Misuse of computer system information occurs, in relevant part, when "as a result of his accessing or causing to be accessed a computer system, [a person] intentionally makes or causes to be made an unauthorized display, use, disclosure or copy, in any form, of data residing in, communicated by or produced by a computer system." Conn. Gen. Stat. § 53a-251(e)(1).

*Damages*

Having found that defendant is liable for both the CUTSA and computer crime claims, I now turn to the issue of damages. CUTSA states that "a complainant may recover damages for the actual loss caused by misappropriation," and "also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Conn. Gen. Stat. § 35-53(a). It goes on to provide that "if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award under subsection (a) and may award reasonable attorney's fees to the prevailing party." Conn. Gen. Stat. § 35-53(b).

Similarly, the computer crime statute authorizes the award of "actual damages and damages for unjust enrichment not taken into account in computing damages for actual loss, and treble damages where there has been a showing of wilful and malicious conduct." Conn. Gen. Stat. § 52-570b(c). It also states that "in any civil action brought under this section, the court shall award to any aggrieved party who prevails, reasonable costs and reasonable attorney's fees." Conn. Gen. Stat. § 52-570(b)(e).

These two damages schemes are almost identical, and plaintiff has made clear that it does not seek duplicative recoveries under both statutes. Both statutory schemes provide for compensatory damages for actual loss and for unjust enrichment, and effectively for treble damages if I find that defendant's behavior was wilful and malicious. The one major difference is that the computer crime law grants costs and attorney's fees to every prevailing plaintiff, while CUTSA only authorizes an award of attorney's fees in the event of wilful and malicious conduct by a defendant.

In this case that difference is immaterial, however, because I find that defendant's conduct was wilful and malicious. The Connecticut Supreme Court has had several occasions to consider the standard for an award of punitive damages under CUTSA, and the touchstone of that inquiry is whether a defendant "misappropriated a trade secret with the intent to injure *the owner of the trade secret*." *Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 245–46 (2007); *see also Elm City Cheese Co. v. Federico*, 251 Conn. 59, 92 (1999) (upholding an award of punitive damages under § 35-53(b) where defendant was "on a course for Elm City's demise rather than to enter into fair competition"). It does not appear that the Connecticut courts have ever elaborated on the precise requirements for treble damages under the computer crime statute, but I have no reason to think the rule would be meaningfully distinct from that under CUTSA, or from general principles of punitive damages under Connecticut law. *See Lydall*, 282 Conn. at 245 ("Punitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.") (quoting *Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 128 (1966)).

Here it is clear that defendant's intent in accessing plaintiff's computer system without authorization and misappropriating the trade secrets therein was to injure plaintiff, the owner of those trade secrets, rather than to engage in any sort of fair competition. This conclusion is strongly supported by the fact that defendant not only used the misappropriated data to launch an arbitration claim against plaintiff but also fraudulently altered some of the documents in an attempt to manufacture a claim where none existed.

I therefore award plaintiff compensatory damages of $1,146,489.55, and punitive damages of $2,292,979.10. These compensatory damages are equal to the total documented expense plaintiff bore in defending the arbitration action brought by defendant using the

14

information from the USB drive, minus the sanctions award from the arbitration ruling for defendant's falsification of evidence. The punitive damages award is equal to twice compensatory damages, as provided by both statutes. Plaintiff is also entitled to an award of costs and attorney's fees, again as provided by both statutes.

*Injunction*

Plaintiff has also requested injunctive relief, specifically an order requiring "TASK to destroy any and all documents remaining in their possession, either in hard copy or electronically." Doc. #34 at 23. CUTSA provides that "actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction." Conn. Gen. Stat. § 35-52(a). Such an injunction "shall be terminated when the trade secret has ceased to exist, but [may] be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." *Ibid*. "In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Conn. Gen. Stat. § 35-52(c).[5]

I find that injunctive relief is appropriate in this case. By taking information off the USB drive without authorization, defendant engaged in actual misappropriation of trade secrets. Defendant's continued possession of this information poses a threat to plaintiff, as defendant could use the information to gain an unfair competitive advantage. I will therefore order defendant to return the USB drive to plaintiff, and to destroy any and all copies of the

---

[5] As this is a diversity action in which state law provides the rules of decision, I am also guided by state law as to the availability of equitable relief. *See* 19 Fed. Prac. & Proc. § 4513 (3d ed.) ("as a general rule, when forum state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction"). I would nonetheless reach the same conclusions under the familiar four-part test for the exercise of federal equitable remedies. *See U.S.S.E.C. v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

information obtained from the drive. I will further enjoin defendant from making any use of that information henceforth.

## CONCLUSION

The Court finds for plaintiff on both its CUTSA and computer crime claims. Plaintiff has proven by a preponderance of the evidence that defendant is liable to it for $1,146,489.55 in compensatory damages and $2,292,979.10 in punitive damages, as well as an award of attorney's fees and costs yet to be determined. Plaintiff may submit an application for reasonable attorney's fees and costs within 30 days of the entry of judgment.

Defendant is further ORDERED to return the USB drive to plaintiff, and to destroy any and all copies of the information obtained from the drive, and ENJOINED from making any use of that information henceforth.

The Clerk of Court shall enter judgment and close this case. The Court shall retain jurisdiction of this case for the purpose of enforcing the terms of this judgment, and to enter an amended judgment in the event plaintiff files a properly supported motion for attorney's fees and costs.

It is so ordered.

Dated at New Haven this 2nd day of February 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge